**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| DAVID LEBLANC, SARA LEBLANC, and SEAFARING RESTAURANT GROUP, LLC d/b/a THE OMELETTE FACTORY,<br>*Plaintiffs*,<br>v.<br>TOWN OF OGUNQUIT, MAINE,<br>*Defendant.* | Case No. ____ |

# COMPLAINT

HARTWELL LEGAL, PLLC

Benjamin E. Hartwell
Maine Bar No. 006619
400 Congress St., Suite 300
Portland, ME 04101
(207) 800-1919 (main)
(207) 800-1913 (direct)

INSTITUTE FOR JUSTICE

Daniel Woislaw*
Texas Bar No. 24138725
Virginia Bar No. 91180
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936 (phone)
703-682-9321 (fax)
dwoislaw@ij.org

Griffin Brunk*
Pennsylvania Bar No. 338483
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
703-682-9320 (phone)
703-682-9321 (fax)
gbrunk@ij.org

* *Pro hac vice* certifications to be filed

*Counsel for Plaintiffs*

Plaintiffs David LeBlanc, Sara LeBlanc, and Seafaring Restaurant Group, LLC (collectively, "Plaintiffs") bring this civil rights lawsuit against Defendant Town of Ogunquit, Maine ("the Town").

## INTRODUCTION

1. This lawsuit seeks to vindicate the free speech rights of David LeBlanc, Sara LeBlanc, and their business the Omelette Factory to display tin rooster statues in front of their home in Ogunquit, Maine. The Town has unconstitutionally targeted the roosters for removal not because they pose any risk to health or safety, but because of the expressive content of a message the Town perceives them to convey. This perceived message is based on the fact that the LeBlancs own a breakfast restaurant called the Omelette Factory that is operated from their home. Based on the LeBlancs' ownership of this restaurant, Town officials decided that the roosters must be advertising for it. Because the Town perceives the roosters' message as commercial, it has classified them as "signs" that violate the Town's sign code and must come down.

2. The roosters were never meant to sell eggs. They are for the LeBlancs' six-year-old adopted daughter, P.L., who has autism. For P.L., transitions—like leaving home for the school bus and coming back again—are among the hardest parts of the day. Roosters are P.L.'s favorite animal and a source of comfort and structure. After P.L. persuaded her father to bring home a six-foot-tall tin rooster, the family discovered that the statue helped her through those transitions. She tucks herself into its tail feathers while she waits for the bus, and she pats its chest when she gets home. The LeBlancs bought more, decorated them for the seasons and the holidays, and lined them up along the edge of their lawn.

3. Over time, the roosters became a piece of Ogunquit's local color and a symbol of autism awareness and acceptance. But the Town of Ogunquit has demanded that they come down. It says the roosters are not art but "advertising signs," and that they exceed what its sign code

allows. It has fined the LeBlancs, ordered them to remove the roosters, and fined them again. When the LeBlancs appealed, the Town's Zoning Board of Appeals agreed to let them keep two roosters by granting them a narrow variance—but only if the statues were made part of a railing attached to the family's home. The home has no such railing. When the LeBlancs asked the Town how they could comply, the Town did not answer. Instead, it fined them again.

4. After the Town ordered the LeBlancs to cull their flock, the LeBlancs' neighbors responded by fostering many of the LeBlancs' roosters in their own yards, in front of their own homes and businesses within Ogunquit, in solidarity with P.L.

5. Neighbors and friends of the LeBlancs now prominently display to the public within the Town of Ogunquit at least nine of the LeBlancs' own roosters—roosters that the LeBlancs previously displayed on their own property resulting in the present controversy.

6. Other friends, neighbors, and residents of Ogunquit display similar rooster statues (that do not belong to the LeBlancs) prominently to the public from private property belonging to others within the Town of Ogunquit.

7. As of October 8, 2026, the Town had not fined, cited, or taken any enforcement action against any property owner for displaying rooster statues, with the sole exception of the LeBlancs.

8. On information and belief, the Town has not fined, cited, or taken any enforcement action against any property owner for displaying rooster statues between October 8 and the date of the filing of this Complaint.

9. The Town's sign code gives officials no principled way to tell a decoration from an advertisement, so officials decide based on what they think a display means and who is displaying it. A tin rooster in a neighbor's yard is yard art. The same rooster in front of the LeBlancs' home

is, in the Town's view, a "sign" for the Omelette Factory subject to the sign code. This is governmental discrimination based on the content of speech and the identity of the speaker. Such discrimination is presumptively unconstitutional, and the Town cannot justify it.

10. The Town's laws, policies, and actions violate Plaintiffs' free speech rights. Town officials have no right to police art in a family's front yard based on what they perceive that art to express, and Dave and Sara should not have to pay escalating fines and risk further penalties in order to exercise their freedom of speech by displaying the art that pleases them and their daughter. Plaintiffs thus seek a declaration that the Town's enforcement of its sign code against the LeBlancs' roosters is unconstitutional, an injunction prohibiting future enforcement, and compensatory and nominal damages. Only through equitable relief will P.L., the LeBlancs, and the community at large continue to enjoy the art in their yard.

**JURISDICTION AND VENUE**

11. Plaintiffs bring this civil rights lawsuit pursuant to the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs seek a declaration that the Town's enforcement of its sign regulations against Plaintiffs' rooster statues violates the First and Fourteenth Amendments; injunctive relief to protect their roosters from forced removal and further penalties; compensatory damages; and nominal damages of $1.00.

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (civil rights jurisdiction).

13. Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). As described below, Plaintiffs and Defendant reside in this district, and the events giving rise to Plaintiffs' claims occurred in this district.

## THE PARTIES

14. Plaintiff David LeBlanc is a resident of Ogunquit, York County, Maine. He is a co-owner of the Omelette Factory, a breakfast restaurant, and the father of P.L.

15. Plaintiff Sara LeBlanc is a resident of Ogunquit, York County, Maine. She is Dave's wife, a co-owner of the Omelette Factory, and the mother of P.L.

16. Plaintiff Seafaring Restaurant Group, LLC is a private limited liability company incorporated in Maine and owned and operated by the LeBlancs. It does business as the Omelette Factory, the local eatery located at 422 Main Street in Ogunquit, ME that Dave and Sara LeBlanc own and operate.

17. Defendant Town of Ogunquit is a municipal corporation located in York County, Maine. The Town, through its Code Enforcement Officer and its Zoning Board of Appeals ("Board"), administers and enforces Chapter 225 of the Town Code (the "Zoning Code"), including its sign regulations.

## STATEMENT OF FACTS

### A. The LeBlancs and the Omelette Factory.

18. The Omelette Factory, located at 422 Main Street, Ogunquit, Maine, has served hot meals to residents and visitors for more than 40 years. It is a neighborhood institution, and, in the summer, there is often a line out the door.

19. The property at 422 Main Street includes a structure that contains both the Omelette Factory and the LeBlancs' residential home within the same building. The parcel on which the home and restaurant sit is zoned both for commercial restaurant use and single-family residential use.

20. Dave and Sara LeBlanc are newcomers to Ogunquit. After careers in food service and early childhood education, they had planned to retire to Ogunquit, Maine. The LeBlancs had

vacationed in Ogunquit for years, and, when the Omelette Factory came up for sale, they bought it and moved to the town in May 2025.

21. The Omelette Factory shares a building with the LeBlancs' home. The restaurant occupies one side of the building, and the LeBlancs' residence occupies the other.

22. The LeBlancs' adopted daughter, P.L., is six years old. She first came into Sara's care as an infant, when she attended one of Sara's childcare centers, and the LeBlancs later adopted her. P.L. has autism. While she is smart and energetic, she struggles with transitions between locations and departures from routine.

23. Under Federal Rule of Civil Procedure 5.2(a)(3), Plaintiffs refer to their minor daughter by her initials.

**B. P.L.'s roosters.**

24. For many children with autism, routines and transitions are very important. Changes in setting—such as leaving home for school or coming back again—can be overwhelming. For P.L., the walk from her front door to the school bus, and the walk back, were a daily struggle.

25. Roosters are P.L.'s favorite animal. She chose roosters as her own symbol, and they help her find comfort when connecting with the world around her.

26. In May 2025, Dave took P.L. to a Tractor Supply store to buy dog food. P.L. noticed a large tin rooster statue and asked her father what the rooster was "saying." P.L. said she believed that the rooster was saying it wanted to go home with them. Dave bought it, and they carried it home together and set it in front of the house.

27. The effect on P.L. was immediate. The six-foot tin rooster became a landmark, a ritual, and a source of safety for her. While she waits for the bus each school day, P.L. tucks herself into the gap behind and between the rooster's tail feathers. When the bus arrives, she pops out

from behind the rooster and hands the driver a breakfast sandwich from the Omelette Factory as she boards. When she returns in the afternoon, she runs past the rooster, taps it on the chest twice, runs up the front steps, taps another rooster on the chest, and often gives it a hug before she goes inside. That routine helps P.L. transition between home and school.

28. The roosters also keep P.L. safe. The LeBlancs' home sits near a busy road, and P.L. has a tendency to run while playing. The roosters are lined up along the edge of the lawn, and P.L. understands that they mark the boundary beyond which she is not to go.

29. Seeing how much the first rooster helped, the LeBlancs bought more. Over time they acquired roughly two dozen tin roosters, nearly identical to one another, though of varying size and design. The LeBlancs never displayed more than eight at once on their property, with the exception of the Christmas holiday season, when they arrange the roosters to appear as if they are the reindeer pulling Santa's sleigh.

30. The LeBlancs rotate their rooster statues in and out of their yard and often dress and paint them for the seasons and holidays—pumpkins in the fall, Christmas decorations in the winter. P.L. as well as the LeBlancs and their friends and neighbors have helped paint several of the LeBlancs' roosters.

31. The roosters stand on the lawn in front of the residential side of the LeBlancs' home at 422 Main Street. They bear no words, no name, no logo, and no reference to the Omelette Factory or to any product or service. There are two exceptions during the period when the LeBlancs displayed roosters and received fines and notices of violation from the Town. First, the LeBlancs have displayed a custom-designed rooster gifted to P.L. by Tractor Supply Company that is emblazoned with P.L.'s name. Second, the LeBlancs have displayed a tin rooster that they painted blue and emblazoned with autism awareness symbols and a quotation from Dr. Mary Temple

Grandin, an autistic academic, inventor, and ethicist and leading voice for neurodiversity awareness and acceptance whose work with animals has reshaped much of the livestock industry, shown in Figure 1.




Figure 1 (above).

32. Passersby loved the roosters. People stopped to take pictures. The roosters became a piece of Ogunquit's local flavor and a symbol of autism awareness and acceptance. Parents of autistic children have told the LeBlancs what the roosters mean to them.

33. The LeBlancs did not place the roosters in front of their home to advertise the Omelette Factory. They placed them there for P.L.

34. To the extent the roosters express anything beyond their value as art, what they express is love for their daughter.

35. The Omelette Factory is almost always busy. It did not need roosters to attract customers.

36. At some point after the roosters became popular, the LeBlancs added a rooster to the logo on the Omelette Factory's t-shirts and other merchandise, which are sold inside the restaurant. The LeBlancs describe the rooster as the family's "crest." That merchandise does not depict the roosters on the lawn.

### C. The Town's enforcement violates the First Amendment regardless of whether the roosters are personal or commercial speech.

37. Plaintiffs reject the Town's assertion that the roosters are commercial speech. However, even if the roosters were treated as commercial speech, the Town's enforcement against them would be unconstitutional, as its prohibition does not directly advance a substantial government interest and is more extensive than necessary to serve any such interest.

38. The rooster statues concern lawful activity, are not misleading, and propose no transaction.

39. The Town has never identified any substantial interest served by enforcing its sign code against the roosters.

40. The LeBlancs' roosters do not obstruct sidewalks, roadways, or sight lines and they do not endanger anyone. No Town official has claimed otherwise.

41. The Town's enforcement against the LeBlancs did not advance any interest in health, safety, aesthetics, or any other hazard. Its only effect was to move the roosters from the LeBlancs' property to other private properties where they are still displayed to the public throughout Ogunquit, ME.

42. The Town's enforcement has been far more extensive than necessary to serve any legitimate interest.

**D. The Town discriminates through its sign code based on its subjective perception of the expressive content of art.**

43. The Zoning Code regulates "signs." Section 225-2.2 defines a "sign" as, with exceptions, any structure "attached thereto or painted or represented thereon or therein, regardless whether it is located out-of-doors or inside, which shall display or include any letter, word, model, banner, flag, pennant, insignia, device or representation used as, or which is in the nature of, an announcement, direction or advertisement and which is intended for or effectively achieves the result of announcing, directing and/or advertising to the out-of-doors public." Zoning Code § 225-2.2.

44. The Zoning Code defines an advertising sign as "a sign which identifies the goods or services available at a business or provides information about those goods and services." *Id.*

45. Under that definition, whether a display is a regulated "advertising sign" depends entirely on what the Town perceives to be its expressive content. If Town officials think it is "in the nature of" an "announcement, direction or advertisement," or "effectively achieves the result" of advertising to the public, and it exceeds the Zoning Code's narrow size limitations for such signage, then it is illegal. If the official perceives the display to express something else, it is legal. The legality of the display thus turns entirely on what an official thinks the display means.

46. The Zoning Code's sign regulations provide that "business or residential signs" may not "be erected, altered, or relocated without issuance of a permit from the Code Enforcement Officer," and then restrict their number, size, placement, and mounting. Zoning Code § 225-8.12.

47. The Zoning Code does not define "sign" by size, location, structure, or safety risk. It does not mention statues, sculptures, or yard art. It does not clearly tell residents when a decorative object is art and when it is a "sign."

48. The Zoning Code requires that "the aggregate sign area of all advertising signs for an establishment shall not exceed six square feet and no advertising sign shall have any dimension greater than three feet." Zoning Code § 225-8.12(E).

49. The LeBlancs' rooster statues at the center of this controversy, including those depicted in Figure 1 (*supra* ¶ 31) and Figure 2 (*infra* ¶ 56), stand higher than three feet tall.

50. Here, the Town has decided that the LeBlancs' roosters are signs because the LeBlancs own the Omelette Factory, and Town officials have therefore imagined the roosters to say "eat at the Omelette Factory."

51. In reality, the roosters mean different things to different people. Some view the roosters as symbols of neurodiversity awareness or acceptance. Others see them as aesthetically appealing (or unappealing) lawn art. To Dave and Sara LeBlanc, the roosters are art, a comfort for their daughter, and a symbol of their love for her. To P.L., the roosters are her friends and a beacon of safety and comfort as she navigates the world.

52. When the very same roosters stand in front of a neighbor's home, the Town treats them as decorations, not signs.

53. The LeBlancs would own and display these roosters regardless of whether they owned a restaurant. Yet, merely because the LeBlancs happen to own an eatery, the Town considers their roosters a sign for it.

54. The Town's decision to enforce its sign regulations against Plaintiffs' roosters is based on the content of the message the Town perceives, and on the identity of the speaker, rather than on any risk a tin rooster poses to public health or safety.

55. The LeBlancs' roosters are located on the lawn in front of the residential side of the building, at a height and in a position intended for P.L. They do not obstruct sidewalks, roadways, or sight lines. They do not endanger anyone. No Town official has claimed otherwise.

56. Since the Board's decision granting them a narrow variance, the LeBlancs have displayed two rooster statues chained to the pillars flanking their front door, as shown in Figure 2 below. Following threats and fines by the Town, the LeBlancs removed all rooster statues, including those shown in Figure 2, from their yard.




Figure 2 (above).

**E. The Town targets the roosters.**

57. On or about April 3, 2026, the Town notified the LeBlancs by letter that they were in violation of the Zoning Code for "unpermitted signage" and "overage of allowable square

footage of signage." The letter "ordered" the LeBlancs "to immediately . . . remove all unpermitted signage, including but not limited to rooster statues[.]" A true and correct copy of this letter is attached as Exhibit 1.

58. On or about April 6, 2026, the Town sent another letter to the LeBlancs imposing a "$150 fine for illegal signage" because of the roosters. The letter included language indicating that the Town had the authority "to impose a civil penalty of $150 for each day the violation remains uncorrected." A true and correct copy of that letter is attached as Exhibit 2.

59. On or about April 16, 2026, the Town sent another letter to the LeBlancs imposing an additional $300 fine for failing to remove their rooster decorations. A true and correct copy of that letter is attached as Exhibit 3.

60. Each of the preceding letters was signed by Tyler McOsker as the Town's Code Enforcement Officer. Mr. McOsker communicated the Town's position to the LeBlancs that the roosters are signs because they are believed to be advertisements for the LeBlancs' restaurant.

61. On information and belief, Mr. McOsker has not claimed that the roosters block any sidewalk or roadway, obstruct drivers' view, or endanger anyone.

**F. The Zoning Board of Appeals sustains the sign determination and grants a conditional variance.**

62. The LeBlancs timely appealed their fines to the Town of Ogunquit Zoning Board of Appeals (the "Board"). They argued that the roosters are not signs and, in the alternative, that the Board should grant them a variance because the roosters help P.L.

63. On or about June 11, 2026, the Board heard the appeal.

64. The Town, through the Board, affirmed and ratified Mr. McOsker's determination that the roosters are signs.

65. During the Board hearing on June 11, 2026, one member of the Board criticized the LeBlancs' roosters as "grotesque" and not fitting with his "definition of ambiance."

66. The Board granted a variance, which it described as a disability variance. Under that variance, the LeBlancs may keep two roosters, on the residential side of the building, on the condition that the roosters be incorporated into a railing affixed to the residence.

67. The LeBlancs' home does not have a railing, P.L. does not need a railing, and the LeBlancs do not wish to add a railing to their home. The LeBlancs want to put roosters on their lawn because of the role they play in P.L.'s life. Building a railing they don't need and affixing roosters to that does not advance the roosters' therapeutic purpose.

68. Because the Town had prohibited them from displaying the roosters on their own lawn, the LeBlancs removed the remaining roosters from their lawn and fostered them to friends and neighbors to display in those friends' and neighbors' yards.

69. Because the Board's decision was ambiguous, the LeBlancs did the closest thing they could to what the Board required; they chained the two remaining roosters to the decorative pillars flanking the front door of their home.

**G. The Town fines the LeBlancs again.**

70. The Town was not satisfied. On or about June 24, 2026, the Town (via Tyler McOsker) issued an additional $500 fine to the LeBlancs for failing to build a railing to which the two roosters allowed by variance must be affixed. A true and correct copy of that letter is attached as Exhibit 4.

71. On or about September 17, 2026, Mr. McOsker sent the LeBlancs yet another letter imposing a fine, this time a $750 civil penalty for failure to remove the roosters or affix them to a railing. The letter characterized the roosters that flank the LeBlancs' residential home's front door

as "a short term risk or nuisance" without further explanation. A true and correct copy of the letter is attached as Exhibit 5.

72. The LeBlancs have paid all fines assessed against them to date, including the $750 penalty, under protest. As of the date of this Complaint, no enforcement proceeding is pending against the LeBlancs in any state court or administrative forum.

73. As of the date of this Complaint, the LeBlancs have removed their roosters from public sight, despite their desire to continue displaying them on their property, to avoid further fines and sanctions from the Town.

**H. The community rallies behind the roosters.**

74. When the Town ordered the LeBlancs to cull their flock, people in the community responded. Friends, neighbors, and customers stepped forward to "foster" the roosters. The first was a customer who lives up the road. Within days, he had asked for more, because his neighbors wanted roosters too.

75. Today, at least 14 homes and businesses throughout Ogunquit display tin roosters, in support of P.L. and as a symbol of autism acceptance. They stand in front of private homes and in front of businesses.

76. A map of the roosters has been shared online, and photographs of roosters in yards as far away as New Zealand have been sent to the LeBlancs.

77. Many of the roosters on display in Ogunquit are the very same statues that were on the LeBlancs' lawn and which they have loaned to friends and supporters who display them proudly.

78. The Town considers only the LeBlancs' roosters to be "signs."

79. According to the Town's own records, no other person or business in Ogunquit has been fined, cited, or noticed for a violation of the sign code for displaying a rooster decoration on their property.

80. In July 2026, the LeBlancs filed a records request under Maine's Freedom of Access Act ("FOAA"), 1 M.R.S. §§ 400 *et seq.* A true and correct copy of this request is attached as Exhibit 6.

81. In their FOAA request, the LeBlancs specifically sought "[a]ny records showing previous enforcement actions involving artwork, sculptures, lawn ornaments, public art, or similar displays that were determined to be signs under the Ogunquit Zoning Code" and "[a]ny records discussing whether similar sculptures, artwork, decorative displays, or lawn ornaments elsewhere in Ogunquit have been reviewed or cited as signage."

82. On September 22, 2026, Ogunquit's Town Clerk/FOAA Officer made available to the LeBlancs a flash drive containing all records responsive to the request. That set of disclosures contained no records relating to prior enforcement actions, whether historical or in relation to rooster statues.

83. When the LeBlancs asked if any further disclosures were forthcoming, the Ogunquit Town Clerk responded via email on October 8, 2026, that "[t]he records provided to you in response to your FOAA request[] were all of the public records in the possession of the Town that were responsive to your request. The Town did not withhold any documents. With this response, I have closed this FOAA request." A true and correct copy of this email is attached as Exhibit 7.

**I. The Town ignores identical roosters in front of other homes and businesses.**

84. The rooster statues in front of other Ogunquit homes and businesses are no smaller, no fewer, no more securely mounted, and no less visible than those in front of the LeBlancs' home,

the last of which the Town deemed signs. Figures 3 and 4 are true and correct images of rooster statues prominently displayed to the public from private property not owned by the LeBlancs within Ogunquit, Maine.




Figure 3 (above).




Figure 4 (above).

85. The only difference between the roosters in the LeBlancs' yard and those in others' yards in Ogunquit is the family or person displaying them on the property.

86. The FOAA records also indicate that the Town does not apply its sign regulations to other decorative objects displayed on residential and commercial properties in Ogunquit—such as lobster buoys, nautical art, antique farm equipment, or large tiki statues—including at properties that also contain businesses.

87. Several businesses in Ogunquit display art visible from public streets and sidewalks, many of which are greater than three feet in at least one dimension and bear a clear and obvious relationship to the products and services they provide. The Town has not noticed, cited,

or fined any of them for violating the Zoning Code for their displays, despite that such displays would violate the Zoning Code if deemed "advertising signs" by the Town.

**J. Plaintiffs risk further punishment.**

88. The Town seeks to enforce the sign regulations of the Zoning Code, including §§ 225-2.2 and 225-8.12, against Plaintiffs to prevent them from displaying their roosters.

89. Under Maine law, if the LeBlancs were to put the roosters back on their lawn, the Town may seek civil penalties accruing on a daily basis. See 30-A M.R.S. § 4452.

90. The Town has already assessed fines of $1,700 against the LeBlancs, and the Town has told the LeBlancs that it will continue to enforce the Zoning Code against them if the roosters remain.

91. If the LeBlancs' roosters are treated as signs, then they violate the Zoning Code's size and permitting requirements, and Plaintiffs must either abstain forever from displaying their roosters or face further fines and enforcement proceedings.

92. If the LeBlancs' roosters are treated as decoration, like those of their neighbors, then they need no permit, they violate no size limit, and Plaintiffs are not at risk of any penalty.

**INJURY TO PLAINTIFFS**

93. The Town's sign code and the Town's policies and practices regarding the enforcement of that code violate Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution.

94. Plaintiffs want to display their tin roosters in front of their home without the threat of fines and code enforcement hanging over their heads.

95. Plaintiffs want to display their roosters because of the message the roosters convey to themselves, P.L., and those in the community who understand their significance. Plaintiffs also

believe the roosters are beautiful and want to convey aesthetic beauty in addition to the underlying substantive meaning.

96. Plaintiffs do not want the Town to dictate the meaning of the roosters as advertising objects or impose on the roosters a meaning Plaintiffs do not intend.

97. By imposing a meaning on the roosters that Plaintiffs do not intend and have never intended, the Town is forcing Plaintiffs to behave as though they are communicating an advertising message that they are not.

98. By imposing a meaning on the roosters that Plaintiffs never intended, the Town is subjecting Plaintiffs to sign code regulation that would not apply if the Town didn't impose its own meaning on the roosters. The Town does not subject others with lawn art to the sign code because the Town does not ascribe an advertising message to other lawn art.

99. The Town has told Plaintiffs on multiple occasions that Plaintiffs cannot keep their roosters because they are illegal under the Town sign code challenged here.

100. The sign code is the official policy of the Town as duly enacted by its legislative body, which is the official policymaker.

101. The Town code enforcement officer has repeatedly cited the LeBlancs, resulting in numerous fines, which the LeBlancs have paid.

102. In citing the LeBlancs repeatedly, the code enforcement officer is enforcing the Town's official policy with the actual or constructive knowledge of the Town policymaker.

103. The Town zoning board of appeals affirmed the Town's interpretation of the sign code, further illustrating that the actions taken against the LeBlancs are official Town policy enforced with the actual or constructive knowledge of the policymaker.

104. Because of the Town's repeated enforcement of the sign code against the LeBlancs' roosters, including its most recent penalty, Plaintiffs reasonably and credibly fear continued and escalating enforcement against them if they put their roosters back out for P.L., including more fines and other options such as seeking injunctive relief against the roosters.

105. The Town's continued enforcement of the sign code against Plaintiffs exposes them to a stark choice: give up their protected speech and P.L.'s roosters, or expose themselves to continued fines and penalties.

106. The Town's variance, moreover, permits the LeBlancs to keep only two roosters and requires them to be incorporated into a railing that the LeBlancs' home does not have. It is a band-aid on a First Amendment bullet wound.

107. But for the Town's interpretation and enforcement of the sign code as against the LeBlancs, Plaintiffs would display their roosters in front of their home as they did before, and as their neighbors do today.

108. But for the Town's interpretation and enforcement of the sign code, Plaintiffs would not be subject to an unconstitutional distinction between themselves and neighbors who display roosters, some belonging to the LeBlancs, without being subject to the sign code.

109. But for the Town's interpretation and enforcement of the sign code, Plaintiffs would be able to display their roosters and convey the message of love and acceptance for their daughter P.L. and acceptance and support for people with autism, as well as convey the aesthetic beauty that the roosters possess.

110. But for the Town's interpretation and enforcement of the sign code, Plaintiffs would not have their personal and artistic choices overridden by the Town and subject to Town regulation.

111. But for the Town's unconstitutional sign code and enforcement practices, Plaintiffs would not have to modify their speech or risk further punishment.

112. But for the Town's interpretation and enforcement of the sign code, Plaintiffs would not be subject to a complex sign code and bureaucratic process to apply for a permit they cannot get because the rooster display they want is too large and has too many roosters.

113. Plaintiffs' speech is being chilled by the Town's enforcement of its sign code against the LeBlancs' rooster decorations.

114. Plaintiffs have incurred damages in the form of unconstitutional fines, lost time spent opposing the Town's unconstitutional enforcement, emotional harm, and reputational harm. Many of these categories of damages continue to accrue.

## CAUSES OF ACTION

### Count I: Freedom of Speech (as-applied)

115. Plaintiffs incorporate and re-allege each and every allegation contained in paragraphs 1 through 114 of this Complaint as if fully set forth herein.

116. Count I is brought pursuant to the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, and challenges the Town's sign code, and the Town's enforcement of it against Plaintiffs' roosters, as applied to them.

117. The Free Speech Clause of the First Amendment protects the right of individuals and businesses to express themselves through physical displays of art on their own property.

118. Plaintiffs' roosters are speech that is protected by the Free Speech Clause of the First Amendment, as applied to Maine and the Town of Ogunquit via the Fourteenth Amendment. The roosters are visual art. They express support for P.L. as well as autism awareness and acceptance, and have come to represent a family crest.

119. Plaintiffs want to continue to display their roosters without the threat of fines and other penalties hanging over their heads. But Town officials have clearly and credibly threatened continued enforcement of the sign code against Plaintiffs, making Plaintiffs fearful of exactly that.

120. Statues and other physical displays of messages are speech protected by the First Amendment.

121. The Town's enforcement of its sign code against Plaintiffs' roosters is an unconstitutional content-based and speaker-based restriction on speech.

122. Despite the Town generally regulating physical displays of speech via its definition of "sign" in § 225-2.2 of the Zoning Code, the Town's policy and practice allows some displays to go unregulated, depending on the content the Town perceives in them and the identity of the person displaying them, while targeting the LeBlancs specifically.

123. It is the Town's policy and practice to allow displays that the Town considers noncommercial, or artistic in some noncommercial way. It is the Town's policy and practice not to consider such displays to be "signs."

124. It is also the Town's policy and practice to allow such perceived noncommercial displays without requiring a permit or fee, without limiting their size or number, and without demanding that they be taken down.

125. Whether Town officials deem a display commercial or noncommercial based on its perceived subject matter or message is a content-based restriction on free speech.

126. Whether Town officials deem a display commercial or noncommercial is also a speaker-based restriction on free speech, as it turns on the identity of who is displaying it. This is evidenced by the Town's treatment of the LeBlancs' roosters as signs while ignoring the very same roosters in others' yards.

127. Imposing different burdens on speech depending on who is speaking and what is being said is a content-based and speaker-based restriction on free speech.

128. Content-based and speaker-based restrictions on speech are subject to strict scrutiny. In order to survive this level of scrutiny, the Town must show that its content-based and speaker-based restriction is narrowly tailored to further a compelling government interest. The Town cannot meet this burden.

129. The Town has no evidence that its enforcement of the sign code against Plaintiffs' roosters is narrowly tailored to further a compelling government interest.

130. The Town also has no evidence that its discrimination against displays that it perceives to be related to a business is narrowly tailored to further a compelling government interest.

131. Thus, the Town's different treatment of speech based on speaker and content, as applied to Plaintiffs' roosters, is an unconstitutional content-based and speaker-based restriction on speech under the First Amendment.

132. Plaintiffs' roosters do not present a safety hazard. No Town official, including Mr. McOsker and members of the Board, has ever stated that the roosters present a safety hazard.

133. Any interest the Town might assert in public safety, traffic safety, or aesthetics is not served by prohibiting Plaintiffs' roosters while permitting identical roosters on neighboring properties. Whatever concern a tin rooster presents does not change based on who owns it or on what Town officials imagine it means.

134. The Town's sign code, as applied to Plaintiffs' roosters, and its enforcement against them, is not narrowly tailored to serve any substantial, important, or compelling government interest.

135. The Town's enforcement of its sign code against Plaintiffs' roosters is an unconstitutional restriction of speech under the First Amendment.

**Count II: Unconstitutional Vagueness (facial and as-applied)**

136. Plaintiffs incorporate and re-allege each and every allegation contained in paragraphs 1 through 135 of this Complaint as if fully set forth herein.

137. Count II is brought pursuant to the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, and challenges the Town's sign code both facially and as applied to the LeBlancs and their rooster statues.

138. The First Amendment and Fourteenth Amendment's Due Process Clause require that state and local laws give fair notice of what conduct they prohibit or require, before any violations can be punished, especially as enforcement affects free speech and expression.

139. As written, the Ordinance is unconstitutionally vague.

140. Sections 225-2.2 and 225-8.12 of the Zoning Code define a "sign" to include any structure, or part thereof, that includes "any letter, word, model, banner, flag, pennant, insignia, device or representation" that is "used as, or which is in the nature of, an announcement, direction or advertisement," and that is "intended for or effectively achieves the result of announcing, directing and/or advertising to the out-of-doors public."

141. The Ordinance further identifies three sub-types of signs. As relevant here under the Town's interpretation, an "advertising sign" is defined as "a sign which identifies the goods or services available at a business or provides information about those goods and services." Zoning Code § 225-2.2(B).

142. The Ordinance fails to define what it means for an object to "effectively achieve the result of" advertising, and no provision of § 225 supplies a standard by which an ordinary

property owner, or enforcement officer, could distinguish between a decorative object and a regulated "sign."

143. Without any such criteria, an object may be deemed a "sign" solely on the ground that it somehow, no matter how tangentially, or coincidentally "effectively achieves the result of" advertising in the subjective eye of the governmental beholder. The same is true even if the owner intended their décor to express an altogether different, noncommercial message.

144. Without any objective criteria or a meaningful standard for assessing whether speech is artistic or a sign, Ogunquit's code enforcement personnel wield unbridled discretion for interpreting, and therefore defining, a speech object's message and categorization.

145. The Defendant Town has not specified, and the Ordinance does not supply, any criterion by which the LeBlancs could have determined in advance that their rooster statues would be treated as a sign, as opposed to protected artistic expression.

146. Similarly, Defendant Town has not specified, and the Ordinance does not supply, any criteria by which P.L.'s roosters are somehow advertisements, when the other rooster statues around Ogunquit are not.

147. Exercising ordinary intelligence, the LeBlancs had no fair notice that P.L.'s roosters would be interpreted as unpermitted advertising signage, as the statues contain no words related to the Omelette Factory; no commercial messaging; no information about their restaurant's goods or services; and, most simply, roosters do not lay eggs.

148. The only links between P.L.'s roosters and the Omelette Factory are simple proximity and the identity of their owners.

149. Altogether, the Town's Ordinance is unconstitutionally vague under the First and Fourteenth Amendments, both facially and as applied to the LeBlancs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. An entry of judgment declaring that the Town's treatment of Plaintiffs' rooster statues as "signs" under the Zoning Code violates the First and Fourteenth Amendments as applied to Plaintiffs;

B. An entry of judgment declaring that the Town's Zoning Code is unconstitutionally vague facially as to its definition of advertising signs and as applied to Plaintiffs' rooster statues.

C. A permanent injunction prohibiting Defendant from enforcing Zoning Code §§ 225-2.2 and 225-8.12, and other similar sign regulations in the Zoning Code, against Plaintiffs' roosters;

D. An award of damages in compensation for the Town's unconstitutional enforcement against Plaintiffs, including the fines assessed against and paid by Plaintiffs resulting from their display of rooster lawn art;

E. An award of nominal damages in the amount of $1.00 for the violation of Plaintiffs' constitutional rights;

F. An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

G. All further legal and equitable relief as the Court may deem just and proper.

DATED this 16th day of November, 2026.

Respectfully submitted:

HARTWELL LEGAL, PLLC

/s/Benjamin E. Hartwell
Benjamin E. Hartwell
Maine Bar No. 006619
400 Congress St., Suite 300
Portland, ME 04101
(207) 800-1919 (main)
(207) 800-1913 (direct)

INSTITUTE FOR JUSTICE

Daniel Woislaw*
Texas Bar No. 24138725
Virginia Bar No. 91180
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936 (phone)
703-682-9321 (fax)
dwoislaw@ij.org

Griffin Brunk*
Pennsylvania Bar No. 338483
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
703-682-9320 (phone)
703-682-9321 (fax)
gbrunk@ij.org

* *Pro hac vice* certifications to be filed

*Counsel for Plaintiffs*